UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GABRIEL MOSBY,<br><br>        Petitioner,<br><br>    v.<br><br>GIGI MATTESON,<br><br>        Respondent. | Case No.  23-cv-00888-PCP<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY** |

## I.    INTRODUCTION

Petitioner Gabriel Mosby has filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his 2017 conviction, for which he was sentenced in 2019. ECF 1.[1] Respondent has filed an answer and a memorandum of points and authorities in support of his answer. ECF 10, 10-1. Mr. Mosby has filed a traverse. ECF 14. The Court has carefully considered the arguments in the petition and the memorandum of points and authorities. For the reasons set forth below, the petition is denied and a certificate of appealability will not issue.

## II.    BACKGROUND

On December 11, 2017—after approximately seven days of evidence[2] and two days of deliberation[3]—a San Mateo County Superior Court jury found Mr. Mosby guilty of four counts of

---

[1]  Docket page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by the parties.

[2] Opening statements were made on trial day 33, November 17, 2017. ECF 11-3 at 267. Evidence was presented on trial days 33, 34, 35, 36, 37, 38, and 39. *Id.* at 267–293; ECF 11-5 at 32–35. Closing arguments were made on trial day 41, December 7, 2017. ECF 11-3 at 296–97.

[3] Deliberation began on trial day 42, December 8, 2017. ECF 11-3 at 299. The jury deliberated again on trial day 43, December 11, and reached a verdict that afternoon. ECF 11-4 at 86.

1    second-degree robbery, found it true for each count that the robbery was done with a firearm,

2    found him guilty of five counts of false imprisonment, and found it true for each count that a

3    firearm was used. ECF 11-4 at 50–67. Mr. Mosby was convicted on the theory that he aided or

4    abetted the robbery, as he was not alleged to have been inside the bank when it took place.

5        On January 11, 2019, the trial court sentenced Mr. Mosby to two consecutive and two

6    concurrent 25 years to life sentences for the robbery counts, and 12 years concurrent for the false

7    imprisonment counts, for a total of 50 years to life. ECF 11-4 at 266–68.

8        Mr. Mosby filed an appeal. ECF 11-4 at 264. On March 4, 2022, the state appellate court

9    affirmed the judgment. *People v. Mosby*, No. A156282, 2022 WL 632190, at *1 (Cal. Ct. App.

10   Mar. 4, 2022).  The California Supreme Court denied review on June 15, 2022. ECF 11-49 at 77.

11       On February 28, 2023, Mr. Mosby filed this federal petition. ECF 1.

12   **III.    STATEMENT OF FACTS**

13       Mr. Mosby was tried with co-defendant Wilson. The state appellate court addressed Mr.

14   Mosby's and Wilson's appeals together, and summarized the facts as follows:[4]

> 15    The bank robbery took place at a First National Bank located at 6600
> 16    Mission Street in Daly City shortly after noon on September 15, 2016.
>       The operative amended information charged four people with
> 17    participating in it: Wilson, Mosby, and two other men, Daniel
>       Velazquez-Cordero (Velazquez) and Deon Jefferson Taylor, Sr. The
> 18    theory of the prosecution was that Velazquez and Taylor went into
>       the bank and carried out the robbery, Velazquez acting as gunman and
> 19    Taylor scooping up the money; Mosby went briefly into the bank
>       beforehand, passed information along to Velazquez and Taylor, and
> 20    kept watch outside; and Wilson drove the getaway car. Mosby and
>       Wilson were tried jointly, separately from the other two defendants.
>
> 21    ***Mosby Enters the Bank Before the Robbery***
> 22    A man wearing a red beanie and a red shirt entered the bank about 25
>       minutes before the robbery. He was not a regular customer of the
> 23    bank. He went up to a teller, asked for and received change for a $20
>       bill, took candy from a jar kept for customers, and left. He was in the
> 24    bank for approximately 15 or 30 seconds. The teller who assisted him
>       identified him at trial as Mosby.

25   ────────────────

26   [4] The Court has independently reviewed the record as required by AEDPA. *Nasby v. McDaniel*,
     853 F.3d 1049, 1055 (9th Cir. 2017). Based on the Court's independent review, the Court finds
27   that it can reasonably conclude that the state court's summary of facts is supported by the record
     and that this summary is therefore entitled to a presumption of correctness, *Taylor v. Maddox*, 366
28   F.3d 992, 999–1000 (9th Cir. 2004), overruled on other grounds by *Murray v. Schriro*, 745 F.3d
     984, 999–1000 (9th Cir. 2014), unless otherwise indicated in this order.

United States District Court
Northern District of California

*The Robbery*

Just after 12:20 that afternoon, two men wearing masks and dark clothing went into the bank, told everyone to get down, and loudly demanded cash. One of the robbers held a gun that looked like an automatic weapon.

The other man, whose mask was red or red and white (described by one person as a Spiderman mask) and who was shorter than the gunman, jumped over the counter toward a teller and told her to open the drawer and give him the cash. The teller complied, and he told her to open the other drawer. She told him there was no key to the other drawer under the counter and it contained only paperwork. Other tellers also opened their cash drawers, and he took money from one of them. He put the money into a bag he was carrying. The robbers left the bank. While they were in the bank, they did not appear to use any electronic device to communicate with someone outside.

More than $10,000 was missing from the tellers' drawers, including several bills of "bait money" with documented serial numbers. The tellers were instructed not to give bait money to customers.

A customer at the bank, R. Vargas, was standing at a counter, her purse on top of the counter, when the robbers entered. When the man with a gun told people to get down she lay face down on the floor. When the robbery was over, Vargas got up and saw that her purse was gone. It contained her phone, her passport, credit cards, her identification, cash, and checks. Later, her credit card accounts showed charges at a number of East Bay stores, and the cards themselves would be found in Wilson's hotel room.

*Surveillance Videos*

Detective Brandon Scholes of the Daly City Police Department arrived at the bank shortly after the robbery. He viewed surveillance videos from cameras in the surrounding area. The bank is on the west side of Mission Street at the intersection of Vista Grande Avenue; a block to the west of Mission Street is Santa Barbara Avenue.[1]

> 1. The jury viewed a Google map of the area surrounding the bank, which is not included in the record on appeal. We have obtained from Google Maps a map of the area, and on our own motion we take judicial notice of it to provide context for testimony using street names. (Evid. Code, §§ 452, subd. (h), 459, subd. (a); *In re Gary F.* (2014) 226 Cal.App.4th 1076, 1078, fn. 2 [taking judicial notice of map not included in record].)

The surveillance videos were taken on Mission Street across from the bank, Vista Grande near the bank, and approximately a block away on Santa Barbara.

At trial, Detective Scholes described the surveillance videos taken around the time of the robbery. A clip from a camera across the street from the bank showed a Black man wearing a red beanie and t-shirt, later identified as Mosby, looking in the direction of the bank. When

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

a pedestrian walked by, Mosby pulled out his phone and put it to his ear, then put the phone down when the pedestrian passed by as if, in Detective Scholes's estimation, he were trying to look like he was doing something legitimate like making a phone call. Another video clip showed Mosby pacing back and forth with his phone out, but not appearing to do anything with it, then stepping into an alcove, putting his head out by a few inches, and looking toward the bank. A clip from 12:18 to 12:19 p.m., just minutes before the robbery, showed Mosby turning from Vista Grande onto Mission Street, putting his phone to his ear, and running to the corner. Another clip from around the same time showed the two bank robbers walking up Vista Grande toward Mission and Mosby walking up Vista Grande from the intersection of Santa Barbara toward Mission Street, almost parallel to the robbers; Mosby looked in another direction, then his hand went up.

Video clips from 12:23, about the time the robbery was going on, showed Mosby walking quickly down Vista Grande toward Santa Barbara, then the robbers moving the same way 45 or 50 seconds later, then a two-door gold car that appeared to be a Cadillac driving away. Videos of apparently the same gold car from a surveillance camera on Santa Barbara appeared to show a Black man wearing something red or red and white on his head. The car was heading toward a major street that led to an entrance to northbound Highway 280.

Scholes later received a lead from another officer, Tracy Boes, who reviewed images from the videos and believed the man in the red beanie and red shirt resembled Mosby. Scholes looked at a photo of Mosby from the Department of Motor Vehicles and located the Facebook page of Mosby's wife, Rosetta, which contained pictures of Mosby wearing red clothing, including what appeared to be the same beanie. He concluded Mosby was the man in the surveillance videos.

### Evidence Found in Searches
a. *Mosby*
Mosby was apprehended at the Gateway motel in Fairfield on September 22, 2016. Detective Scholes recognized him from the surveillance photos and his distinctive gait. Mosby was with his wife and a man later identified as Velazquez. The room was registered to Velazquez. When apprehended, Velazquez had $1,405 with him, none of it the bait money from the bank.

Officers searched Rosetta's home and found a red shirt and white Adidas shoes with black stripes that appeared to be the same as the shirt and shoes worn by the person in a surveillance video near the bank before the robbery. The shirt was on a hanger and had no wrinkles, looking as if could have been a new shirt or a shirt that had been taken to the cleaners.

b. *Wilson*
On September 19, 2016, acting on a lead, officers went to an Extended Stay hotel in Pleasant Hill. Wilson arrived in a gold Cadillac El Dorado, which held a loaded black semiautomatic firearm, a wallet with Wilson's identification card, credit cards in the names of three other people, and a digital scale with traces of suspected heroin.

Wilson had on his person $1,600 in cash, including three bills with serial numbers that matched the bait money. The officers searched a hotel room registered to Wilson and found a plaid backpack that appeared to be the same as that used by one of the robbers. Inside the bag were Vargas's credit cards and identification cards. Officers also found a laptop computer, a black object that appeared to be a credit card skimming device, blank cards with magnetic strips, a digital scale, and what appeared to be lactose cut with heroin.

A woman later identified as Janeen Harrison, with whom Wilson had a romantic relationship, had used Vargas's credit card at a Buy Buy Baby store in Pleasant Hill, near the Extended Stay hotel where she and Wilson were staying. When she was apprehended, checks in Vargas's name were found in her purse. Harrison told police officers on September 19 that she first saw Vargas's cards and checks either on September 14, the day before the bank robbery, or September 15, the day of the robbery, and that she received them on September 17.

Scholes and other officers also searched Wilson's house, where they found Wilson's wife, his son, and Taylor. Taylor was standing near a bedroom that had distinctive wooden blinds and a 49ers poster. The bedroom closet contained Taylor's wallet and identification, as well as a jacket, sweatshirt, black pants, and shoes that were similar to those worn by one of the suspects in the bank surveillance videos.

***Cell Phone Evidence—Texts, Calls, Videos, and Locations***
Police examined a cell phone associated with Mosby. A text to Mosby's phone from Wilson's phone number on September 11 said, " 'Hope you be here real early so we get that $." Another text from Wilson's phone said, " 'Lil Bra, now the best time to do the job is in the morning when they open up, but we can get $ [ ] between morning and noon so let's do this shit and get it out the way. Hit me when you get a chance. One love.' " Text messages from a phone number associated with Velazquez on the morning of September 15, the day of the robbery, indicated he and Mosby were making plans to meet and at 8:55 a.m. said, " 'I am here.' "

Mosby's cell phone carrier's records showed calls and text messages on September 15 until around 9:00 a.m. Specifically, between 5:15 and 9:02 a.m., there were multiple calls to and from Wilson's number. There were multiple calls with Velazquez's number between 7:27 a.m. and 8:56 a.m., then an incoming call from Velazquez at 12:20 p.m. that did not connect. There was a call between Mosby's phone and the number associated with Taylor at 8:59 a.m. There was then a gap until 12:34 p.m., during which there were no calls or texts with the exception of the incomplete call from Velazquez just a minute before the robbery.

Detective Scholes searched Wilson's cell phone. On it, he found an application called Marco Polo, which allows users to exchange video messages. There was a video between Wilson and Taylor on September 15, the day of the robbery, which also contained an image of Mosby wearing the same red beanie seen in surveillance videos and a jacket that looked like the one worn by the robber who wore a red mask. In the video, Wilson said something about Taylor "having fun in my house." Taylor was standing in what appeared to be a residence,

in front of wooden blinds in a room with a 49ers poster; the blinds and poster appeared to be the same as those in the room in Wilson's house that Taylor apparently occupied.

Wilson's cell phone contained text messages from the phone number associated with Mosby that mirrored those on Mosby's phone. There were messages between Wilson and Taylor from the days starting on September 10, in which Wilson told Taylor he wanted to talk with him about " 'some serious stuff' " that would " 'make us or break us,' " Taylor said he did not want to walk into anything "wit [*sic*] my eyes closed," and Wilson assured him they would not. There was also a message from Taylor at 8:51 on the morning of the robbery.

The cell phone call records of Wilson, Taylor, and Mosby showed that on the morning of the robbery, Wilson's phone initially connected to cell towers in Vallejo, Fairfield, and Pleasant Hill. Beginning at 10:00 a.m. the records for all three phones showed movement from towers in the Vallejo area to Daly City. Between 12:05 and 12:23 p.m., the three phones were using towers in Daly City. Taylor's cell phone carrier showed that he made calls using the same tower in Daly City used by Mosby and Wilson's phones around the time of the robbery and at no other time. Records from Wilson's cell phone carrier showed six calls to or from Taylor and Velazquez between 12:05 p.m. to 12:22 p.m. using the same cell tower in Daly City that was used by Mosby's phone. This was the only time Wilson's phone used a tower in Daly City. Mosby's cell phone records similarly did not show any indication of him being in Daly City at any other time between September 2, when his phone was activated, and September 22, when he was arrested. The carrier records showed the three phones returning from the Daly City area to Vallejo between 12:23 p.m. and 2:10 p.m.

### *Janeen Harrison's Testimony*

Harrison testified at trial under a grant of immunity. In September 2016, she was living at the Extended Stay hotel with Wilson, although he also spent time with his wife in Vallejo. Wilson paid for the room. Harrison was aware Wilson sold drugs, that he was having money problems, and that he owed money to someone. He drove a gold or yellow two-door car.

On September 14, 2016, Wilson told Harrison he needed to get money and he had to go to his house in Vallejo. Early the next morning, he told her that he would be back by 12:00, that he had to try to get some money, and that they "would be okay" financially once he had done so. Later that day, he returned to the hotel with a large amount of cash in different denominations—more than he would usually carry—and credit cards in a woman's name. Harrison said to him, " 'I see you got a few dollars,' " and he answered, " 'Yeah, it didn't go like I thought it was going to. I didn't get what I thought I was gonna get, but we'll be all right.' " He asked her to get a bag out of his car, and in the back seat of the gold car she found an empty backpack that she recognized as one she owned, the same backpack the police later seized because it resembled that used in the robbery.

The following day, Harrison used, or tried to use, credit cards Wilson had given her to make purchases at stores. He had told her he got the

1
2
3

> cards from "one of his partners." After she was apprehended, police officers asked Harrison who Wilson might commit a crime with, and she said, " 'I don't know. They all got nicknames like Dee and Buss.' " At trial, she described Dee as a short Black man who lived at Wilson's house, and Buss as someone with a wife named Rosetta; she "assum[ed]" he was the person sitting next to Wilson at trial.

4

*Mosby*, 2022 WL 632190 at *1–5.

5

## IV.    DISCUSSION

6

### A.    Legal Standard

7
8

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

9
10
11
12
13
14
15
16

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

17
18
19
20
21
22
23
24
25
26
27
28

1

2

3

4

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991).[5] In reviewing each claim, the court must examine the last reasoned state court decision that addressed the claim. *Cannedy v. Adams*, 706 F.3d 1148, 1158 (9th Cir. 2013), *amended*, 733 F.3d 794 (9th Cir. 2013).

5

**B.    Claims and Analysis**

6

7

8

9

10

11

The Court previously found cognizable Mr. Mosby's following claims: (1) there was insufficient evidence to support his bank robbery convictions on an aiding and abetting theory; (2) the trial court violated his due process right to a fair trial when it denied his motion to sever; and (3) the trial court committed a constitutional error by admitting evidence of a pretrial identification. ECF 5 at 2. The last reasoned state court decision to address these claims is the state appellate court's decision.

12

**1.    Sufficiency of the Evidence**

13

14

15

16

Mr. Mosby argues that the prosecution's theory "rested on petitioner allegedly serving as a lookout" and on the theory that he had cased the bank prior to the robbery, but there was insufficient evidence to establish that he served those functions "or in any way aided and abetted the commission of the robbery," and his conviction was unconstitutional. ECF 1 at 5–6.

17

18

19

20

21

22

23

On direct appeal, Mr. Mosby argued that evidence that he was in the vicinity of the bank prior to the robbery was insufficient to establish that he participated as an aider or abettor. ECF 11-47 at 48. He claimed he "could not have effectively functioned as a lookout watching for the appearance of law enforcement or eyewitnesses, since he was absent from the scene at the most critical time." *Id.* at 48–49. Mr. Mosby emphasized the absence of evidence that he ever communicated with the two men who went inside and robbed the bank, prior to or during the robbery. *Id.* at 49.

24

25

Mr. Mosby argued, on direct appeal and in his traverse, that Detective Scholes's search warrant affidavit incorrectly stated that the 6598 Mission Street surveillance video showed Mr.

26

27

28

[5] Although *Ylst* was a procedural default case, the "look through" rule announced there has been extended beyond the context of procedural default. *Barker v. Fleming*, 423 F.3d 1085, 1091 n.3 (9th Cir. 2005).

United States District Court
Northern District of California

Mosby appearing to yell out at two men walking on the other side of the street, and that the prosecutor argued that "there was evidence that [Mr. Mosby] and the two robbers were walking parallel to each other on two sides of the street and that appellant communicated with them, either 'yelled' or 'called out' to them," although the video contained no audio. ECF 11-47 at 49–50, ECF 14 at 18. He also argued that Detective Scholes's "claim that he saw an African American male wearing a red hat in the front passenger seat of the gold Cadillac El Dorado was also unsupported by the video evidence" because the car appeared in the video for one and a half seconds. ECF 11-47 at 50–51, ECF 14 at 18–19.

Mr. Mosby also argued that he was not in the bank for long enough prior to the robbery to gather any information for the robbers, and he was not connected to the robbery by any physical evidence. *Id*. at 51–52. He was not found with any bait money, nor did any DNA evidence connect him to the robbery. *Id.* at 52. Mr. Mosby argued that there was no evidence that he had the specific intent to aid and abet in the commission of the robbery. *Id.*

### a.    Federal Authority

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979) which, if proven, entitles him to federal habeas relief, *see id.* at 324.

In the federal habeas context, a court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992) (quoting *Jackson* 443 U.S. at 319).

The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas proceedings." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam). Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction.

United States District Court
Northern District of California

9

1   *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995); *but see Kipp v. Davis*, 971 F.3d 939, 957,

2   958–59 (9th Cir. 2020) (granting writ where, after prior bad acts evidence was rejected, "the case .

3   . . for [the instant] attempted rape and special circumstance of intent to kill during attempted rape

4   was circumstantial"). Mere suspicion or speculation cannot support logical inferences, however.

5   *Walters*, 45 F.3d at 1358.

6       A federal habeas court applies the standards of *Jackson* with an additional layer of

7   deference. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). Generally, a federal habeas court

8   must ask whether the operative state court decision reflected an unreasonable application of

9   *Jackson* to the facts of the case.  *Coleman*, 566 U.S. at 651. To grant relief, therefore, a federal

10  habeas court must conclude that "the state court's determination that a rational jury could have

11  found that there was sufficient evidence of guilt, i.e., that each required element was proven

12  beyond a reasonable doubt, was objectively unreasonable." *Boyer v. Belleque*, 659 F.3d 957, 964–

13  965 (9th Cir. 2011).

**b.      State Appellate Court Decision**

15  The state appellate court rejected Mr. Mosby's claim that the evidence was insufficient:

> Both Mosby and Wilson challenge the sufficiency of the evidence to
> support their convictions on a theory they aided and abetted the two
> people who carried out the robbery. We apply well settled legal
> standards to these questions. A person who aids and abets the
> commission of a crime or advises and encourages its commission is a
> principal in the crime. (§ 31.) To establish guilt under this theory, "the
> prosecution must show that the defendant acted 'with knowledge of
> the criminal purpose of the perpetrator and with an intent or purpose
> either of committing, or of encouraging or facilitating commission of
> the offense.' ... Thus, [our high court has] held, an aider and abettor
> is a person who, 'acting with (1) knowledge of the unlawful purpose
> of the perpetrator; and (2) the intent or purpose of committing,
> encouraging, or facilitating the commission of the offense, (3) by act
> or advice aids, promotes, encourages or instigates, the commission of
> the crime.' " (*People v. Prettyman* (1996) 14 Cal.4th 248, 259, italics
> omitted; accord, *People v. Koenig* (2020) 58 Cal.App.5th 771, 799–
> 800.)
>
> Whether a person has aided and abetted a crime is normally a question
> of fact. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054 (*Nguyen*).)
> Relevant to this determination are " 'presence at the scene of the
> crime, companionship, and conduct before and after the offense.' "
> (*Ibid.*) On appeal, we " ' " 'review the whole record in the light most
> favorable to the judgment to determine whether it contains substantial
> evidence—i.e., evidence that is credible and of solid value—from

which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt.' " ' [Citation.] 'Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.' " (*Id*. at pp. 1054–1055.) "[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*People v. Bean* (1988) 46 Cal.3d 919, 933.)

These principles are illustrated in *Nguyen*. The defendant was convicted of an attempted murder and a related charge of active participation in a gang on a theory of aiding and abetting, and he argued the evidence was insufficient to support the conviction. (*Nguyen*, *supra* 61 Cal.4th at p. 1053.) The evidence showed the defendant was a passenger in a car, which began following a car driven by the victim, carrying several members of a rival gang. (*Id*. at pp. 1026, 1053.) The car in which the defendant was riding passed the victim's car and defendant and the other passengers stared back at the victim's car. The car with defendant idled in a parking lot as the passengers looked out, then followed the victim's car when it passed by. Several blocks later the two cars stopped next to each other at a stoplight, and another passenger in the defendant's car shot the victim. (*Id*. at p. 1053.) A few days later, the defendant went to the home of one of the rival gang members who had been in the victim's car and asked him, " 'What's up with the cops?' " (*Id*. at pp. 1053–1054.) A gang expert testified that members of Asian gangs tended to go from place to place hunting for their rivals and a gang member who was not the shooter and was in the back seat of a car would be expected to back up the shooter if necessary and that members of the rival gangs were expected to be able to engage in gunfights. (*Id*. at p. 1054.) This evidence, our high court concluded, although not overwhelming, supported an inference that the defendant knew of the shooter's intent to kill, shared that intent, and aided him by spotting potential targets. (*Id*. at pp. 1055–1056.)

### A. Substantial Evidence of Mosby's Guilt

Applying these principles, we conclude there is substantial evidence that Mosby aided and abetted the robbers. His text messages indicated that in the days leading up to the robbery he and Wilson were making plans to go to an establishment early in the day, shortly after it opened, to get money. On the day of the robbery, they made plans to meet, and at 8:55 a.m. Mosby said in a text to Velazquez, " 'I am here.' " Over the next few hours, his cell phone carrier's records showed that his phone travelled from Fairfield to Daly City, on the same course as Wilson and Taylor, and that he did not exchange calls or messages from them during that time. Neither his cell phone nor those of Wilson or Taylor showed they had been in Daly City in the weeks leading up to the robbery, and there is no indication Mosby had any legitimate business there. Nevertheless, he went into the bank and changed money, and the robbery took place shortly afterward. In the intervening time, he was seen standing in an alcove across the street, looking in the direction of the bank, apparently pretending to be on a phone call when people passed by, but his cell phone records showed

no calls during that time. As the two robbers walked down the same street toward the bank, he moved in the same direction and gestured. After the robbery, a man wearing a head covering consistent with his was seen in the gold Cadillac, and his cell phone carrier's records showed he travelled back to Vallejo at the same time as Taylor and Wilson. The evidence is sufficient to allow a jury to infer he knew his companions were about to rob the bank and he aided and encouraged them by surveying the bank from the inside, keeping a watch on it, and signaling to them before they entered.

Mosby argues he was not inside the bank long enough to get useful information and there is no direct evidence he communicated his observations to the others. And he argues that there is no indication he was keeping a lookout at the bank immediately before or during the commission of the robbery. But the issue is not whether it would have been possible for him to do more to facilitate the robbery, it is whether there is sufficient evidence to allow a reasonable factfinder to conclude he aided and encouraged the crimes. The evidence here meets that standard.

*Mosby*, 2022 WL 632190 at *7–8.

### c.    Analysis

The state appellate court's finding was not contrary to, or an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts in light of the evidence. Aiding and abetting under California law requires knowledge of the crime and intent to participate or assist. The state appellate court's determination that a rational jury could have concluded that Mr. Mosby was aware of Velazquez's and Taylor's intent to commit robbery, and that Mr. Mosby intended to participate in or facilitate the robbery, was reasonable.

Detective Scholes testified at trial that the call log physically extracted from Mr. Mosby's phone started on September 16, the day after the robbery, whereas the records from T-Mobile showed calls on the September 15. ECF 11-35 at 142. The T-Mobile records showed a gap in messages and calls between 9:49 AM and 12:34 PM except for one call at 12:20 PM. *Id.* at 143, 148. Between 5 and 9 AM, the records showed 14 calls back and forth between Mr. Mosby and Wilson. *Id.* at 144–45. He testified the records showed five calls between Mr. Mosby and Velazquez between 7 and 9 AM and a sixth at 12:20 PM. *Id.* at 146. And one call between Mr. Mosby and Taylor at 8:59 AM. *Id.* at 147. The robbery took place around 12:23 PM. *Id.* Detective Scholes testified that the 12:20 call, which did not connect or go through, was the only call between September 2, when the phone was activated, and September 22, associated with a cell

phone tower in Daly City. *Id.* at 152–53.

Mr. Mosby sent text messages to "Big Bev," whom Detective Scholes identified as Wilson, including on September 11 "Hope you be here real early so we can get that money $" and on September 12 "Lil Bra now the best time to do the job is in the morning when they open up but we can get $ between morning and noon so let's do this shit and get it out the way hit me when you get a chance one love." ECF 11-3 at 143, 11-35 at 154. On September 14, Mr. Mosby messaged Wilson, "Lil Bra all we is doing is waiting on who ever show up first and plus my Boy he wants to get down the only thing is I don't have no gas I just Barely made it here my boy is in Fairfield you know the one I been trying to call you its almost 9:00." ECF 11-3 at 147.

Mr. Mosby exchanged messages with "D Lil," whom Detective Scholes identified as Taylor, including one from Taylor on September 13 saying, "Talk to me bruh…wtf," and later that day, "Buss[6] dat was 3.00 blood iz damn near 9:00 are u serious grocery shoppin now, u ask me to get it done, got it done ma said 2hrs shit more 10." ECF 11-3 at 143. Mr. Mosby responded to Taylor, "He just text me and said something about going to the house and to meet him I am about to call him then I will hit you in a few." *Id.* On September 17 at 3:34 and again at 4:39 AM, Taylor messaged him, "Call me wtf." ECF 11-3 at 144.

Mr. Mosby exchanged messages with "Danny," whom Detective Scholes identified as Velazquez, including one from Velazquez on September 14 that read "You coming or not" and a series on September 15 that ended with Mr. Mosby writing "I am here" at around 9 AM.[7] ECF 11-

---

[6] Buss is a name associated with Mr. Mosby. ECF 11-35 at 168.

[7] The text exchange between Danny and Mr. Mosby went as follows:

| Danny | 7:24 AM: hey boy you up call me when you get home |
| | 7:35: N |
| | 7:38: I'm going to go to the store |
| | 7:40: Get me in the store |
| | 8:03: I'm waiting for you in dover |
| | 8:10: hurry up bro is because I tell my boss I have appointment |
| Mr. Mosby | 8:11: On my way Bra |
| Danny | 8:13: OK um and apartment by my mom |
| Mr. Mosby | 8:16: Where is that I forgot |
| Danny | 8:18: The one that you buy a hammer |
| | 8:24: you call row las night |
| Mr. Mosby | 8:25: yep |

United States District Court
Northern District of California

3 at 144. On September 17 around 7:15 PM, Velazquez messaged "when you finish go to my room," and Mr. Mosby responded at 8:35 PM, "Is you at the room." *Id.* Velazquez responded at 8:43, "What you going to send little d." *Id.* Mr. Mosby asked Velazquez to call him twice on September 19. *Id.* On September 20, Mr. Mosby messaged him, "Call me Boy. You need to call me on ASAP."  ECF 11-36 at 93. On September 22, Mr. Mosby was arrested at a hotel room registered to Velazquez.

Mr. Mosby's text message and call history was sufficient evidence of his communication with the other men for a reasonable jury to conclude that he had the intent to aid and abet the robbery, despite his argument that there was no evidence of any communication *during* the robbery. See ECF 11-47 at 178. Accomplice liability under California Penal Code section 31 extends to anyone who "advised and encouraged" the commission of a crime. Mr. Mosby need not have communicated with the robbers before or during the course of the robbery in order to have advised and encouraged the robbery.

In addition, Mr. Mosby's messages and calls could be consistent with Mr. Mosby having taken a role as a lookout and/or having cased the bank 25 minutes prior. Although he was only inside for less than a minute between 11:30 and noon, as he argued on appeal, the jury need not have found that he provided useful information in order to conclude that his entry into the bank was for the purpose of advising the robbers. His messages and calls, combined with the surveillance footage which the jury could reasonably conclude featured Mr. Mosby, were sufficient evidence for the jury to conclude that he acted as a lookout. If all was going to plan, he might not have needed to communicate with the robbers during the robbery to perform the function of a lookout.[8]

_____

Danny      8:25: OK
           8:50: You still far away broo
Mr. Mosby  8:55: I am here

ECF 11-3 at 144.

[8]As for Mr. Mosby's claims that the prosecutor misrepresented the Mission Street surveillance video to claim that he yelled to the robbers on the street, although Detective Scholes did make that suggestion in his warrant affidavit, the prosecutor did not argue at trial that Mr. Mosby called out or gestured to the robbers. Additionally, the jury members had access to the video and could

United States District Court
Northern District of California

The absence of physical evidence connecting Mr. Mosby to the robbery does not preclude his conviction, as circumstantial evidence can be constitutionally sufficient. Although a jury could have acquitted Mr. Mosby based on the evidence, it was not insufficient to convict him. Because the state court reasonably concluded that the jury reasonably convicted Mr. Mosby based on the evidence presented, habeas relief is not available for this claim.

### 2.    Lookout Testimony

Mr. Mosby argued in his state appeal, and his traverse in front of this Court, that the trial court committed prejudicial error when it allowed Detective Scholes to testify that he acted as a lookout. ECF 11-47 at 55, ECF 14 at 21. Mr. Mosby did not raise this argument in his petition. He raised, in his first claim, that the evidence of his participation was insufficient, not that it was improperly bolstered by inadmissible evidence in the form of Detective Scholes's testimony that he was a lookout. Mr. Mosby's original petition only challenged, in his third claim, the admissibility of Officer Boes's identification of him. Respondent has not had nor requested the opportunity to address the admissibility of Detective Scholes's testimony about Mr. Mosby operating as a lookout.

Although Mr. Mosby has not properly raised it in his habeas petition, the Court will address it. The state appellate court rejected this claim:

> Before trial, Mosby moved in limine to exclude testimony that he acted as a lookout and aided and abetted the other defendants on the ground it would be improper opinion testimony. The trial court denied the motion, concluding the term "lookout" was a common one and the evidence would not be prejudicial.

> Mosby argues that Detective Scholes on several occasions offered inadmissible opinion testimony that he acted as a "lookout" during the robbery. He contends this testimony was improper because it amounted to expressing an opinion that he was guilty of robbery. (See

decide for themselves what it contained. Similarly, while Detective Scholes did testify at trial that he believed the very brief video of the Cadillac depicted a Black male wearing a red beanie, ECF 11-31 at 64, the jury members could watch the video and decide for themselves. The jury did request the video during deliberation, and the trial court reminded the jurors that that it could not send in a magnifying glass, as discussed in one of the jury instructions. ECF 11-3 at 301. Ultimately, whether or not Mr. Mosby gestured or called out to the two robbers, and whether or not he was in the Cadillac, the evidence was sufficient for the jury to find that he aided and abetted the robbery.

*People v. Vang* (2011) 52 Cal.4th 1038, 1048 [opinions on guilt are inadmissible because the trier of fact is competent to weigh evidence and draw conclusions on guilt]; *People v. Torres* (1995) 33 Cal.App.4th 37, 45–48, 52 [improper for witness to express opinion on elements of crime and guilt or innocence of defendant, but error was harmless]; *People v. Brown* (1981) 116 Cal.App.3d 820, 828–829 [improper opinion testimony that defendant was working as " 'runner' " in drug deal].)

The fundamental problem with Mosby's argument is that Scholes did not testify before the jury that Mosby acted as a "lookout." Our review of the record indicates the only time the jury heard that term was when Scholes testified that Robert Collins, the bank's head of security, knew Mosby was suspected as a lookout and therefore looked at the bank's video for the time before the robbery.[3]

> 3. We invited Mosby's counsel to identify at oral argument the portions of the record at which Scholes testified before the jury that Mosby acted as a lookout. Counsel pointed us only to the testimony about Collins's search of the surveillance video.

When defendants objected on grounds of hearsay, speculation, and improper opinion, the court stated the testimony was offered not for the truth of anything Collins said but to explain why Scholes obtained the video, and it ruled the testimony was admissible only for that purpose, "but not for opinions offered by or any information offered by Mr. Collins." We presume the jury considered the testimony only for this limited purpose (see *People v. Homick* (2012) 55 Cal.4th 816, 866-867) and, in any case, Scholes was not expressing his own opinion that Mosby's actions were those of a lookout.

To the extent Mosby's challenge might extend to Scholes's testimony that when Mosby held a phone to his ear briefly as a pedestrian walked by without manipulating it, he looked like he was trying to appear to be doing something legitimate, we reject the challenge. When Scholes so testified, defense counsel objected, and the court allowed the testimony but admonished the jury, "[Y]ou are the judges of what the significance [of Mosby's behavior] actually is. That may be [Scholes's] opinion. It may or may not be your opinion of what you were watching. The video does speak for itself, but a witness can interpret as they see it. But it's your call." Defense counsel's objections were again overruled when Scholes testified that it appeared to him that Mosby pretended to make a phone call on another part of the surveillance videos.

A witness may express an opinion based on his or her perception where it is helpful to a clear understanding of the witness's testimony. (Evid. Code, § 800; *DeHoyos, supra*, 57 Cal.4th at p. 130.) "A lay witness generally may not give an opinion about another person's state of mind, but may testify about objective behavior and describe behavior as being consistent with a state of mind." (*DeHoyos*, at p. 130; see *People v. Chatman* (2006) 38 Cal.4th 344, 397 [witness was "competent to testify that defendant's behavior and demeanor were consistent with enjoyment" when kicking someone].) And it is not improper for an officer to testify about observations made when

> reviewing a surveillance tape. (*People v. Son* (2020) 56 Cal.App.5th 689, 696–698.)
>
> Scholes's testimony that Mosby appeared be doing something legitimate like making a phone call falls within this rule. In any case, even if the testimony was improper, there is no probability it affected the verdict. The jury was able to view the surveillance videos, and the trial court expressly admonished the jurors that their opinion might differ from that of Scholes and that they, not Scholes, were the judges of the significance of Mosby's actions. There is no reason to conclude the jury could not follow this direction and form its own conclusions. Mosby has shown neither abuse of discretion nor prejudice.

*Mosby*, 2022 WL 632190 at \*9–10.

The state appellate court's conclusion was not unreasonable. Federal courts defer to state courts' interpretation of California evidence law. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999).

To the extent Mr. Mosby's claim is that the admission violated California evidence law on lay and expert testimony, this Court defers to the state appellate court's interpretation that it did not. To the extent his claim is that the admission violated his constitutional rights, this Court looks to federal precedent on lay and expert law enforcement testimony. The Ninth Circuit has allowed expert testimony by law enforcement "regarding even an ultimate issue to be resolved by the trier of fact." *Briceno v. Scribner*, 555 F.3d 1069, 1077 (9th Cir. 2009) (finding no due process violation in habeas claim where law enforcement gang investigator provided expert testimony as to whether hypothetical robberies would have been gang-related).[9] Here, Scholes testified as a lay witness rather than an expert. Other courts in this district have denied habeas claims based upon

---

[9] The Ninth Circuit has also held that pursuant to the Federal Rules of Evidence, law enforcement witnesses "may offer opinions based on" "knowledge derived specifically from an investigation" such as "interpretations of 'ambiguous conversations based upon his direct knowledge of the investigation,' . . . or translate the drug jargon used by the targets of his investigation." *United States v. Perez*, 962 F.3d 420, 435 (9th Cir. 2020).

United States District Court
Northern District of California

admission of improper lay witness testimony. *See Smith v. LeGrand*, No. 314CV00029MMDCLB, 2020 WL 1531450, at *9 (D. Nev. Mar. 31, 2020) (former law enforcement and security officer's testimony that alleged victim "acted like a typical rape victim" had no permissible inferences and was improper lay testimony but was not particularly inflammatory and did not violate clearly established law by the Supreme Court).

Here, similarly, Scholes's testimony, even if improper, was not so inflammatory or prejudicial as to deny him a fair trial. As the state appellate court noted, Scholes did not actually call Mr. Mosby a lookout at trial. He testified that surveillance footage showed Mr. Mosby pulling out his phone without manipulating it and holding it up to his ear when a pedestrian walked by, and then putting it down a few moments later, "indicative of someone who wanted to look like they were doing something legitimate like making a phone call." ECF 11-31 at 51. Counsel objected. The trial court "allow[ed] him to testify to what he took the video to be," but informed the jury: "you are the judges of what the significance actually is. That may be his opinion. It may or may not be your opinion to what you were watching. The video does speak for itself, but a witness can interpret as they see it. But it's your call." *Id.* at 52. Scholes testified that another video showed Mr. Mosby "walking, pacing back and forth again with his phone out and pretending to manipulate it. Doesn't really seem to do anything with it." *Id.* at 53. He testified that Mr. Mosby stepped into an alcove, looked in the direction of the bank, and "[stuck] his head out just a few inches as if not to be seen," and "[saw] a pedestrian and immediately in my opinion preten[ded] to make a phone call." *Id.* Mr. Mosby's counsel preserved the same objection and the trial court applied the same ruling. *Id.*

Scholes further testified that other footage showed Mr. Mosby walking on Mission Street, where he took out his phone, put it up to his ear for a moment, and "runs the corner" a few moments before the robbery. *Id.* at 56–57. He testified the video from 375 Santa Barbara showed "there appears to be a flash of red, appears to be a black male wearing something red on his head" in a two-door older model Cadillac El Dorado. *Id.* at 64. Mr. Mosby's counsel continued to object. *Id.* Scholes testified that a screen shot of the video depicted "the gold Cadillac" and "[i]n the passenger compartment you can see a subject with dark skin wearing what appears to be

something red on the head area with white on it." *Id.* at 66. He testified that footage from 30 Vista Grande showed Mr. Mosby "look in th[e] direction" of the robbers, "then his hand goes up," and Scholes stated "In my opinion he appears to be communicating with them." *Id.* at 69. Mr. Mosby's counsel objected again, and the objection was sustained. *Id.* Scholes also testified that Robert Collins, the head of security for the bank, "was aware of Gabriel Mosby being a suspect as a lookout in this case." *Id.* at 71. Mr. Mosby's counsel objected, and the trial court allowed it as an explanation of why the officer obtained footage of Mr. Mosby at the bank prior to the robbery, rather than for the truth. *Id.*

Mr. Mosby's trial counsel elicited Scholes's testimony that the case was his first case as a detective. *Id.* at 84. He also elicited testimony that the 375 Santa Barbara video in which Scholes opined that there was someone wearing a red hat consisted of one and a half seconds or less, that he could not say with certainty that it was a red hat, and that the robbers had some red in their clothing, although he did not believe the flash of red in the video could be from one of the robber's clothing. *Id.* at 92–93, 95; ECF 11-32 at 11.

The jurors understood that they could interpret the surveillance footage for themselves, as evidenced by the fact that they requested some of the surveillance footage (the video from 375 Santa Barbara Avenue including a brief view of the purported Cadillac) during deliberations. ECF 11-3 at 301.

Even if Mr. Mosby had properly raised his challenge to admission of Scholes's testimony at trial interpreting his conduct on the surveillance footage, the state court's conclusion that the testimony did not deprive him of a fair trial was not contrary to or an unreasonable application of clearly established federal law. Accordingly, habeas relief is not available for this claim.

### 3.    Motion to Sever

Mr. Mosby argues that the trial court violated his due process rights when it refused to sever his trial from defendant Wilson's because the case against him was "far weaker" than the case against Wilson given that there was no evidence linking Mr. Mosby to the proceeds from the robbery and "it is reasonably probably that, if tried alone, petitioner would not have been convicted." ECF 1 at 5–6.

1    In his direct state appeal and his traverse filed in this Court, Mr. Mosby also argued that

2    Wilson's counsel made it clear by seeking admission of ammunition found at Mr. Mosby's

3    address, contrary to Mr. Mosby's and the prosecutor's positions, that counsel was going to point a

4    finger at Mr. Mosby and "strove to infect a fundamental antagonism between the co-defendants at

5    trial." ECF 11-47 at 65, ECF 14 at 31.

6    ### a.    Federal Authority

7    Denial of severance can prejudice a defendant sufficiently to render his trial fundamentally

8    unfair in violation of due process. *Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997). A federal

9    court reviewing a state conviction under 28 U.S.C. § 2254 does not concern itself with state law

10   governing severance or joinder in state trials. *Id. at* 370. Its inquiry is limited to the petitioner's

11   right to a fair trial under the United States Constitution. *Id.* The petitioner must demonstrate that

12   the state court's denial of his severance motion resulted in prejudice great enough to render his

13   trial fundamentally unfair. *Id.* In addition, the impermissible joinder must have had a substantial

14   and injurious effect or influence in determining the jury's verdict. *Sandoval v. Calderon*, 241 F.3d

15   765, 772 (9th Cir. 2000).

16   In evaluating the prejudice due to joinder, the focus is on the cross-admissibility of

17   evidence, i.e., whether evidence of an offense would be admissible in a separate trial on another

18   offense and vice versa. *Walden v. Shinn*, 990 F.3d 1183, 1197 (9th Cir. 2021). "A finding of cross-

19   admissibility dispels the prejudicial impact of joining all counts in the same trial for the simple

20   reason that the jury would have heard the evidence in any event." *Id.* (internal quotation marks and

21   citation omitted).

22   "[T]here is no clearly established federal law requiring severance of criminal trials in state

23   court even when the defendants assert mutually antagonistic defenses." *Runningeagle v. Ryan*, 686

24   F.3d 758, 777 (9th Cir. 2012) (rejecting ineffective assistance of counsel claim premised on

25   counsel's failure to join co-defendant's motion to sever).[10]

27   [10] In the federal criminal context, "severance should be granted 'only if there is a serious risk that
     a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury
28   from making a reliable judgment about guilt or innocence.'" *Hedlund v. Ryan*, 854 F.3d 557, 571
     (9th Cir. 2017) (quoting *Zafiro v. United States*, 506 U.S. 534, 538–39 (1993)).

United States District Court
Northern District of California

### b.   State Appellate Court Decision

The state appellate court rejected this claim:

#### I. Denial of Motions to Sever—Mosby and Wilson

Before trial, all four original defendants sought to have their trials severed from each other, and the trial court denied the motions. Mosby argued that the case against him was weaker than that against the other defendants, that he would be prejudiced by the inflammatory evidence of Wilson's involvement, and that a joint trial would involve conflicting defenses. Wilson argued that he was the defendant with the weakest case because he was not seen on video in the vicinity of the bank, and he contended the weaker circumstantial evidence of his guilt would be bolstered by stronger evidence that the other defendants were involved in the robbery.

The trial court denied the motions. In doing so, it stated that each defendant could have a fair trial in a joint trial, that none of the cases was significantly stronger than the other, and that none of the defendants had given statements implicating the others. Mosby and Wilson each argue on appeal that this ruling was erroneous and deprived them of due process of law.

Our Legislature has established a preference for joint trials. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40 (*Coffman and Marlow*).) Section 1098 provides that when two or more defendants are jointly charged with a crime, " 'they must be tried jointly, unless the court order[s] separate trials.' " Joint trials are favored because they promote judicial efficiency and avoid inconsistent verdicts, and when defendants are charged with " 'common crimes involving common events and victims,' as here, the court is presented with a ' "classic case" ' for a joint trial." (*Coffman and Marlow*, at p. 40.)
Separate trials may be appropriate, however, " 'in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.' " (*Coffman and Marlow*, *supra*, 34 Cal.4th at p. 40.) Severance may also be proper where " ' "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." ' " (*People v. Gomez* (2018) 6 Cal.5th 243, 274 (*Gomez*).) Where defenses are antagonistic, severance is necessary only where the defenses are irreconcilable and the jury will infer unjustifiably that the conflict shows that both defendants are guilty. (*Id*. at p. 275.)

A trial court's denial of a motion to sever is reviewed for abuse of discretion, based on the facts that appeared at the time of the ruling. (*Coffman and Marlow*, *supra*, 34 Cal.4th at p. 41.) Even if there was an abuse of discretion, we reverse only if there is a reasonable probability the defendant would have received a more favorable result in a second trial. (*Ibid*.) Even if the ruling was proper at the time it was made, reversal is appropriate when joinder " 'actually resulted in

"gross unfairness" amounting to a denial of due process.' " (*People v. Mendoza* (2000) 24 Cal.4th 130, 162.)

Mosby contends reversal is necessary because, although both he and Wilson were accused of aiding and abetting the same robbery, neither of them took money or falsely imprisoned anyone inside the bank, and the actions of which they were accused were not " 'common' "— that is, Mosby was accused of pre-robbery conduct and Wilson was accused of driving the getaway car, so there was "little evidentiary connection" between the two cases. And, he argues, Wilson's defense conflicted with his.

. . .

Defendants' arguments are unpersuasive. They were charged with playing different roles in carrying out the same crimes against the same victims in a single incident. Neither behaved in a more shocking manner than the other or was accused of a more serious crime, and there is no basis to conclude either would be prejudiced by association with the other. Neither had made an incriminating confession. (See *Coffman and Marlow*, *supra*, 34 Cal.4th at p. 40.) Although each challenged the sufficiency of the circumstantial evidence of his own participation in the crime, their defenses were not antagonistic or irreconcilable. There is no reason to conclude the jury could not evaluate separately whether the evidence showed each aided and abetted the robbers—Mosby by going into the bank before the robbery and keeping watch outside, and Wilson by driving the getaway car—and make a reliable judgment as to the guilt or innocence of each. (See *Gomez*, *supra*, 6 Cal.5th at pp. 274–275.) Defendants do not dispute that much of the evidence presented at the joint trial would have been equally admissible at separate trials, nor do they show they were prejudiced by the admission of any evidence that would not have been cross-admissible. (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 381 [severance of trial of two defendants from another not required where "much evidence about which they complain would have been relevant even at a separate trial"]; accord, *People v. Souza* (2012) 54 Cal.4th 90, 112 ["no evidence was presented at the joint trial that would not have been presented at a separate trial"].)

In these circumstances, we see neither an abuse of discretion in the trial court's ruling nor gross unfairness to either Mosby or Wilson in the joint trial.

*Mosby*, 2022 WL 632190 at *5–7.

### c.    Analysis

The state appellate court's finding was not contrary to, or an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts in light of the evidence. Mr. Mosby has not identified, nor is the Court aware of, any evidence introduced at trial regarding his involvement in the robbery that would not have been admissible in a separate

trial. Mr. Mosby acknowledged in his appeal that he was not prejudiced by the ruling on the ammunition, as it was excluded. ECF 11-47 at 65. A general sense of antagonism associated with that motion is not enough to render Mr. Mosby's trial fundamentally unfair.

As the state appellate court noted, the cases against Mr. Mosby and Wilson were comparable in strength, and not inconsistent in theory. The fact that Mr. Mosby and Wilson were charged with separate conduct related to the robbery, even if not a "typical case for joinder, where all defendants participate in the same acts," ECF 14 at 29, does not render joinder of their trials unconstitutional for Mr. Mosby because it did not impact any constitutional trial-related right or expose the jury to prejudicial information that it would not have received in a separate trial. That Wilson was linked to proceeds of the robbery and Mr. Mosby was not would not lead a jury to be more likely to convict Mr. Mosby. It could have even assisted his case, in highlighting for the jury that such a link was missing. Trial counsel, in closing, emphasized that Mr. Mosby was not found with bait money, ECF 11-38 at 58, 70–71.

Because the state appellate court reasonably concluded that Mr. Mosby's constitutional rights were not violated by his joint trial, habeas relief is not available for this claim.

### 4.    Admission of the Pretrial Identification

Mr. Mosby argues that the trial court violated his due process rights by admitting into evidence an identification of himself by a San Francisco police sergeant from a still photograph taken from surveillance video in the vicinity of the bank. ECF 1 at 5. After the trial court refused to preclude the identification, Mr. Mosby agreed to a stipulation informing the jury that officer Tracey Boes had identified him from a still photograph, created from a video taken in the vicinity of the bank shortly before the robbery. *Id.* at 7. Mr. Mosby argues that the admission, notwithstanding the stipulation, of Officer Boes's identification of him rendered his trial fundamentally unfair in violation of the Fourteenth Amendment. *Id.* at 8.

On direct appeal, and in his traverse in front of this Court, Mr. Mosby argued that Sergeant Boes's conclusion that the person captured in the still from the surveillance video was Mr. Mosby was lay opinion testimony. ECF 11-47 at 72. While state law permits identification of a defendant as lay opinion testimony, he argued, the standard for admission of such testimony from a law

enforcement official is higher, requiring that no other adequate identification testimony is available to the prosecution. *Id.* at 73. He argued that the admission deprived him of a fair trial and due process because it was highly prejudicial, implying that Mr. Mosby had been a subject of policy scrutiny before the events involved in the criminal case, and not necessary or helpful because the jury members could have looked at the still image and compared it to Mr. Mosby on their own. *Id.* at 76–77. Mr. Mosby argued that although the prosecution "argued that the testimony was necessary for an historical purpose, i.e., to show how [Mr. Mosby] became a suspect,"[11] there were other bases on which he could have been identified as a suspect that would have lacked the prejudicial implication of a law enforcement officer knowing his face and name. *Id.* at 78.

### a.   Federal Authority

The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009), *see also Walden v. Shinn*, 990 F.3d 1183, 1204 (9th Cir. 2021) (*Holley* foreclosed habeas petitioner's argument that admission of crime scene photos was unconstitutionally prejudicial).

Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. *See Henry*, 197 F.3d at 1031; *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991). The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995).[12]  Only if there

---

[11] At the hearing on the motion in limine, the prosecutor explained that the evidence would show there was a specific investigative lead on Mr. Mosby, as there were going to be "a lot of issues . . . raised by the defense as to how these people were targeted . . . and it needs to be very clear that the officers didn't just decide to target African-Americans or someone of Latin descent." ECF 11-14 at 178.

[12] *See, e.g., Walden*, 990 F.3d at 1204–05 (admission of "19 purportedly 'gruesome' crime scene and autopsy photos" did not violate due process because state court reasonably found that photos were relevant to disputed issue of premeditation and to illustrate expert's long and detailed testimony regarding victim's injuries and not unduly prejudicial when only one to three photos were from crime scene and rest were autopsy photos); *Mancebo v. Adams*, 435 F.3d 977, 979 (9th Cir. 2006) (finding that the polygraph evidence played only a minor role at trial and, therefore, the erroneous introduction of evidence that defendant refused a polygraph was not prejudicial in light

are no permissible inferences that the jury may draw from the evidence can its admission violate due process. *See Jammal*, 926 F.2d at 920.

The United States Supreme Court has left open the question of whether admission of propensity evidence violates due process. *Estelle v. McGuire*, 502 U.S. 62, 75 n. 5 (1991). Based on the Supreme Court's reservation of this issue as an "open question," the Ninth Circuit has held that a petitioner's due process right concerning the admission of propensity evidence is not clearly established as required by AEDPA. *Alberni v. McDaniel*, 458 F.3d 860, 866–67 (9th Cir. 2006); *accord Foy v. Gipson*, 609 F. App'x 903, 907 (9th Cir. 2015). *See, e.g.*, *Larson v. Palmateer*, 515 F.3d 1057, 1066 (9th Cir. 2008) (because Supreme Court expressly reserved the question of whether using evidence of prior crimes to show propensity for criminal activity could ever violate due process, state court's rejection of claim did not unreasonably apply clearly established federal law).

### b.   State Appellate Court Decision

The state appellate court rejected this claim:

> Mosby also contends the trial court improperly allowed the jury to hear that another officer, Sergeant Tracy Boes, recognized him from the surveillance videos. He argues that this evidence prejudiced him by informing the jury that he was, or had been, the subject of police scrutiny and that it deprived him of his Fourteenth Amendment right to a fair trial.
>
> Before trial, Mosby moved in limine to exclude any reference to Boes's statements, and the People moved to admit the evidence. At the hearing, the prosecutor explained that still photographs from the surveillance videos had been sent out, apparently to other law enforcement agencies. Boes, who worked for the San Francisco bank robbery investigation unit, recognized Mosby from prior investigations, and Boes's information was the first significant lead in the case. The prosecutor agreed that it would be prejudicial to inform the jury that Boes worked in the bank robbery unit and that he

---

of sufficient evidence supporting petitioner's conviction); *Alcala v. Woodford*, 334 F.3d 862, 886 (9th Cir. 2003) (admission of knives found in defendant's residence was prejudicial constitutional error where the jury could draw no permissible probative inference from evidence, because alleged murder weapon was a knife made by same manufacturer but was commonly available, had a different design, was sold separately and was not owned by defendant); *Thomas v. Hubbard*, 273 F.3d 1164, 1174–75 (9th Cir. 2002) (admission of triple hearsay testimony providing the only evidence that defendant had motive for crime and access to a murder weapon violated confrontation clause and likely due process even if it were the lone error).

had investigated Mosby for several different bank robberies, but she argued that the source of the lead was relevant to demonstrate to the jury that the Daly City police officers did not "just decide to target [Mosby]" but rather acted on a lead and carried out an independent investigation. The trial court ruled that either the parties should agree to a stipulation that Boes believed he recognized Mosby or that Boes could testify "[a]s long as it's limited."

At trial, as Detective Scholes was testifying, the jury heard the following stipulation: "On September 15, 2016 following the bank robbery at First National Bank Sergeant Klier acquired still images of a suspect depicted in the Allstate video surveillance footage. The images depicted a black male adult wearing a red beanie and a red T-shirt. [¶] On September 15, 2016 Officer Tracy Boes reviewed the still images of the suspect and believed the suspect looked similar to Gabriel Mosby." Scholes then went on to testify that after he received this tip, he conducted an independent investigation, looked at Mosby's photo from the Department of Motor Vehicles, searched social media and found Rosetta Mosby's Facebook page, which contained pictures of Mosby, and ultimately contacted Mosby.

Our high court has approved the admission of testimony of officers identifying defendants in surveillance videos or photographs. (*People v. Leon* (2015) 61 Cal.4th 569, 601.) The Court in *Leon* cited *People v. Mixon* (1982) 129 Cal.App.3d 118, 125, 130–131 (*Mixon*), which held proper an identification by Fresno Police Officers William Brown and Kirkus Burks, who viewed surveillance photographs shortly after a robbery took place, recognized the defendant in one of them, then found and arrested him in an area he was known to frequent, and *People v. Perry* (1976) 60 Cal.App.3d 608, 610-613, which found it proper for both the defendant's parole officer and Officer George Brown of the Sacramento Police Department, a police officer who had had numerous street contacts with the defendant, to identify him as a robber depicted in a surveillance film. (*Leon*, at p. 601.) Thus, in both *Mixon* and *Perry*, the jury knew or had information indicating that before the crime at issue, the defendant was well enough known to law enforcement officers that they recognized his image.

Mosby seeks to distinguish these cases on the ground that Boes's evidence was unnecessary for purposes of identifying him—since the jury could view the surveillance videos and judge for itself whether he was at the scene—and that it accordingly did not aid the jury. (See *Mixon*, *supra*, 129 Cal.App.3d at p. 130 [identification must *both* be based on personal knowledge *and* aid the jury in its identification of the person in the video].) We are unpersuaded that there was a prejudicial abuse of discretion or that Mosby was deprived of a fair trial by admission of Boes's identification. The stipulation indicated only that Boes was an officer; it did not inform the jury, directly or indirectly, that Mosby had been investigated for other bank robberies. While we acknowledge that lay opinion identification by police officers may carry a risk of prejudice by suggesting a person has been the subject of police scrutiny (*Mixon*, *supra*, 129 Cal.App.3d at p. 129), the statement here was sanitized so as to minimize that risk, and it was relevant to explain the progress of the investigation. There is no basis to conclude the jury was improperly influenced by hearing

1

the stipulation.

2

*Mosby*, 2022 WL 632190 at *10–11.

3

### c.     Analysis

4

Sanitized as the identification was in the stipulation to remove the fact that Boes worked

5

on bank robberies, including prior robberies involving Mr. Mosby, the jury could still have

6

inferred that Boes knew Mr. Mosby from other criminal activity of his, which is prejudicial. It is

7

unlikely that the jury would have inferred that Boes recognized him for any other reason, such as

8

being neighbors or having children in the same school. But it is not so prejudicial as to deprive

9

Mr. Mosby of a fair trial, and it is less prejudicial than evidence admitted in other cases where the

10

Ninth Circuit found habeas relief unavailable. *See supra* note 10. While inferring that Mr. Mosby

11

had previous contact with law enforcement was an impermissible inference, there were

12

permissible inferences to be drawn from the identification, including that law enforcement

13

discovered Mr. Mosby's identity from the surveillance footage and used it to investigate his

14

involvement in the robbery.

15

The Ninth Circuit has found habeas relief unavailable even where specific propensity

16

evidence was admitted at trial. Here, Boes's identification suggested only vague propensity

17

information. Because there is no clearly established Supreme Court law prohibiting admission of

18

overly prejudicial or propensity evidence, the state appellate court's conclusion that Mr. Mosby's

19

constitutional rights were not violated by admission of Boes's identification of him through the

20

stipulation cannot be revisited in this petition. Habeas relief is not available for this claim.

21

## V.     CERTIFICATE OF APPEALABILITY

22

The federal rules governing habeas cases brought by state prisoners require a district court

23

that issues an order denying a habeas petition to either grant or deny therein a certificate of

24

appealability.  *See* Rules Governing § 2254 Case, Rule 11(a).

25

A judge shall grant a certificate of appealability "only if the applicant has made a

26

substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the

27

certificate must indicate which issues satisfy this standard. *Id.* § 2253(c)(3).  "Where a district

28

court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c)

United States District Court
Northern District of California

is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Mr. Mosby has not made such a showing, and, accordingly, a certificate of appealability is denied.

## VI.    CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the Petition for a Writ of Habeas Corpus must be DENIED.  Further, a Certificate of Appealability is DENIED.  The Clerk shall terminate any pending motions, enter judgment in favor of respondent, and close the file.

**IT IS SO ORDERED.**

Dated: October 22, 2024

P. Casey Pitts
United States District Judge